IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

GARY HORTON,

*Defendant.*

Criminal Action No. ELH-19-115

## MEMORANDUM OPINION

Defendant Gary Horton entered a plea of guilty in July 2021 to the offenses of conspiracy to distribute and possess with intent to distribute heroin, cocaine, and marijuana and possession of a firearm by a felon.  ECF 301.  He also pleaded guilty to a violation of supervised release in case RDB-11-00547 (D. Md.) ("VOSR Case").[1]  On October 25, 2021, the Court sentenced defendant to a total term of 78 months of imprisonment in this case, with credit for time served in custody since November 15, 2018.  ECF 336 (Judgment).  In addition, the defendant received a consecutive sentence of 90 days in the VOSR Case, for a total sentence of 81 months of imprisonment.

Horton, through counsel, has filed a motion for compassionate release (ECF 393, the "Motion"), supported by fourteen exhibits.  ECF 393-1 to ECF 393-14.  The government opposes the Motion (ECF 400, the "Opposition"), supported by ten exhibits.  ECF 400-1 to ECF 400-10.  Horton replied.  ECF 402 (the "Reply").  Defendant has also submitted supplemental correspondence.  ECF 403.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, without prejudice.

---

[1] The VOSR Case was transferred to me so that it could be addressed with case ELH-19-115.  Horton was one of 24 defendants in RDB-11-00547.

## I. Background

Horton was indicted on March 12, 2019, along with six others.  ECF 1.  In particular, defendant was charged with conspiracy to distribute and possess with intent to distribute heroin, cocaine, and marijuana, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute heroin, cocaine, and marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count Three); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Eleven); possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Twelve); and maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count Fifteen).  Horton has been incarcerated since his arrest on March 12, 2019. ECF 15.

Pursuant to a Plea Agreement (ECF 303), defendant entered a plea of guilty on July 23, 2021 (ECF 301), to Counts One and Twelve of the Indictment, and to Violation Number 1 in the VOSR Case.  Violation Number 1 charged defendant with a violation of a Statutory Condition, arising from a drug conspiracy charge in Baltimore County on or about November 15, 2019.  *See* VOSR Case, ECF 971.

The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a total sentence ranging between 60 and 84 months of imprisonment.  ECF 303, ¶ 10.  By statute, Count One in the underlying case carried a mandatory minimum term of five years' imprisonment, with a maximum penalty of forty years of imprisonment.  *Id.* ¶ 4(a).  Count Twelve carried a maximum penalty of ten years of imprisonment.  *Id.*  And, for the VOSR Case, the maximum penalty was two years of imprisonment.  *Id.* ¶ 4(b).

The Plea Agreement contained a lengthy factual stipulation.  It stated, *id*. at 11-12:

On or about September 17, 2012, the defendant, Gary Horton pled guilty in the United States District Court for the District of Maryland to a RICO conspiracy,

in violation of 18 U.S.C. § 1962(d).  He was sentenced on January 2, 2013 to 36 months of imprisonment, to be followed by 5 years of supervised release. Subsequently on June 8, 2016 he was sentenced to an additional 18 months of imprisonment, to be followed by 39 months of supervised release based on a violation of the terms of his supervised release.  The judgment ordered that while he was on supervised release, the defendant was not permitted to commit any federal, state, or local crime.  After serving his sentence of imprisonment, the defendant's supervision commended on or about June 29, 2017 and was not scheduled to expire in the ordinary course until September 7, 2019.

During the fall in 2018, members of the Baltimore County Police Department, Homeland Security Investigations, and the Drug Enforcement Administration worked in partnership to investigate narcotics trafficking activity occurring in and around Baltimore County and Baltimore City, in the District of Maryland. On September 21, 2018, the investigators obtained authorization from the Honorable Judge D. Robinson of the Circuit Court of Baltimore County to intercept wire and electronic communications from several cellular phones associated with coconspirators engaged in trafficking suspected heroin and cocaine. Investigators learned that one of the coconspirators, identified as the Defendant, Gary Horton, was involved in the distribution of narcotics to various other conspirators throughout October and November of 2018. As part of their investigation, investigators conducted court-authorized wiretaps of two of the Defendant's cell phones. Intercepted calls show that the Defendant discussed buying suspected kilogram quantities of heroin with another coconspirator, and during several of these calls, the Defendant would report back to the coconspirator about the quality of the product he had purchased. In addition, coconspirators were observed going to and from the Defendant's residence, located at 103 W. Conway Street.

On November 15, 2018, several search and seizure warrants were executed at locations linked to members of the conspiracy, including 103 W. Conway Street, the Defendant's residence. Inside of 103 W. Conway Street, investigators recovered approximately 1,677 grams of cocaine, approximately 31 grams of heroin, and approximately 2,321 grams of Marijuana. Investigators also found bags with green chunks of an unknown substance, vials of suspected THC oil, and HOH (human growth hormone). They also found cutting agents, including Inosital, Mannitol, and Quinine, as well as a money counter and a kilogram press. Finally, investigators found a Bushmaster XMl5e2S AR-15 rifle, .357 caliber Smith and Wesson revolver, a Taurus 9mm semi- automatic pistol, a .40 caliber Glock semi-automatic pistol, and a 9mm Glock semi-automatic pistol.

Several other search and seizure warrants were executed in parallel with the search described above. Additional quantities of suspected cocaine, heroin, and other narcotics were also recovered at addresses associated with other coconspirators.

The parties stipulate and agree that the drugs recovered from the Defendant's residence were in fact cocaine, heroin, and marijuana, and that they were intended for distribution. The parties stipulate and agree that the amount of narcotics reasonably foreseeable to the Defendant, Gary Horton, as part of the overall conspiracy was between 100 kilograms and 400 kilograms of Converted Drug Weight, and that the cocaine, heroin, and marijuana were intended for distribution.

The parties stipulate and agree that at the time of the possession of the firearms, the Defendant had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, that he knew he had been convicted of the prohibiting crime, and that his civil rights related to the possession of a firearms had not been restored.

The parties further stipulate that the recovered firearms were in or affecting interstate commerce because they had been manufactured outside the State of Maryland, and that all the firearms meet the definition of a firearm pursuant to 18 U.S.C. § 921.

The Plea Agreement reflected that Counts One and Twelve were grouped for purposes of calculating defendant's advisory sentencing guidelines range under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."). *Id.* ¶ 7(c). The parties agreed to a base offense level of 24 for both counts. As to Count One, the offense level was based on the drug quantity, pursuant to § 2D1.1(c)(5) of the Guidelines. *Id.* ¶ 7(a). Also as to Count One, the parties agreed to a two-level increase under U.S.S.G. § 2D1.1(b)(1), because defendant possessed a firearm during the commission of the offense. *Id.* With respect to Count Twelve, the offense level was 24 under U.S.S.G. § 2K2.1(a)(2), because defendant had two prior controlled substance offenses. ECF 303, ¶ 7(b). And, it was increased by two levels under § 2K2.1(b)(1)(A) because between three and seven firearms were possessed. As a result, the Plea Agreement contemplated a final offense level of 26, before deductions for acceptance of responsibility. *Id.* ¶ 7(c). There was no agreement as to defendant's criminal history. *Id.* ¶ 8.

Sentencing was held on October 25, 2021. ECF 332. The calculations in the Presentence Report (ECF 321, "PSR") reflected a three-level deduction for acceptance of responsibility,

pursuant to U.S.S.G. 3E1.1.  *Id.* ¶¶ 26, 27.  Accordingly, as to Counts One and Twelve, the PSR reflected a final offense level of 23.  *Id.* ¶ 28.  However, the government declined to move for the one-point deduction under § 3E1.1(b).  *See* ECF 337 at 1; ECF 386 (Sentencing Transcript) at 3. [2]

At the time of sentencing, defendant was 36 years old.  ECF 321 at 3.  Defendant is 5'11'' tall and, at the time, he weighed 260 pounds.  *Id.* ¶ 60.  Horton stated that he was "recently diagnosed with Post Traumatic Stress Disorder [("PTSD")] and anxiety stemming from the Covid-19 pandemic and being in isolation." *Id.* ¶ 61.  The defendant also has a history of substance abuse.  *Id.* ¶ 64.

The PSR reflected that Horton's criminal history began at age 16.  *Id.* ¶ 33.  He had four other criminal convictions.  *Id.* ¶¶ 34-37.

In particular, in 2004, in the Circuit Court for Baltimore County, defendant was convicted of possession with intent to distribute narcotics.  *Id.* ¶ 34.  And, in 2005, in the Circuit Court for Harford County, he was convicted of the same offense.  *Id.* ¶ 35.  Defendant received a suspended three-year sentence for the 2004 offense, but violated his probation and received the three-year sentence.  *Id.* ¶ 34.  As to the 2005 offense, he received a 15-year sentence, of which ten years were suspended.  *Id.* ¶ 35.  While incarcerated, defendant stabbed an inmate and was convicted of second-degree assault, for which he was sentenced to a consecutive term of two years.  *Id.* ¶ 36.  And, in 2013, Horton was convicted in federal court of conspiracy to participate in a racketeering enterprise, for which he received a three-year sentence and five years of supervised release.  *Id.* ¶

---

[2] In my experience, the government sometimes does not agree to the discretionary one-point deduction under U.S.S.G. § 3E1.1(b) for a defendant who litigates pretrial motions.  Here, Horton litigated several pretrial motions.  *See* Orders at ECF 290; ECF 292.  The defendant was not awarded the third point.

37.  However, in 2016 Horton violated his supervised release and received an 18-month sentence from Judge Bennett, to whom the case was then assigned.

Horton's criminal convictions yielded a subtotal criminal score of 12.  *Id.* ¶ 38.  Two points were added because, at the time the instance offenses were committed, Horton was on supervised release.  *Id.* ¶ 39.  Thus, Horton had a total criminal history score of 14 points, yielding a criminal history category of VI.  *Id.* ¶ 40.

As to Counts One and Twelve, with a final offense level of 24 and a criminal history category of VI, the Guidelines called for a period of incarceration ranging from 100 months to 125 months.  ECF 337 at 1.  And, this is separate from the VOSR Case.  As noted, in the Plea Agreement the parties agreed to a total sentence ranging between 60 and 84 months of imprisonment.  ECF 303, ¶ 10.

In accordance with the terms of the C Plea, the Court imposed a sentence of 78 months' imprisonment for the underlying case, with credit for time served since November 15, 2018.  ECF 336.  That sentence was well below the advisory Guidelines range.  And, as to the VOSR Case, the Court imposed an additional sentence of three months, consecutive, for a total sentence of 81 months of imprisonment.  That sentence was below the top end of the C-plea range.  No appeal was taken by the defendant.

Horton is currently serving his sentence at Beckley FCI.  ECF 400-1; *Find an inmate*, FEDERAL BUREAU OF PRISONS,  https://www.bop.gov/inmateloc/  (last visited May 3, 2023).  Defendant has served about 53 months of his 81-month sentence, or approximately 65% of his sentence.  The Bureau of Prisons ("BOP") indicates that he has a projected release date of September 14, 2025.

On July 21, 2022, Horton filed a request for administrative remedy with the Warden of FCI Beckley.  ECF 393-1.  According to defendant, he did not receive a response from the Warden. ECF 393 at 3.  This Motion followed on November 23, 2022.

The government contests that defendant has exhausted his administrative remedies.  ECF 400 at 15.  In any event, the government argues that the Motion fails on the merits.  *Id*. at 16.

First, the government notes that "Defendant has received two doses of the Pfizer COVID-19 vaccination."  *Id*. at 17.  He received his second Pfizer vaccination on May 27, 2022.  ECF 400-4.  The government also maintains that "Defendant's medical conditions still do not meet the 'extraordinary compelling' threshold necessary to qualify for compassionate release."  ECF 400 at 19.  In regard to defendant's mental health conditions, the governments notes that Horton's medical records demonstrate that the BOP is "adequately monitoring and addressing the Defendant's concerns, including by increasing the dosage of his medication as needed."  *Id*. at 20. And, although the government concedes that defendant has a body mass index ("BMI") of 37.5, the government cites to cases in which "courts have concluded that a borderline-obese BMI or obesity, standing alone, does not meet the 'extraordinary and compelling threshold.'"  *Id*. at 21. The government also contends that, "to the extent the Defendant argues that his conditions of confinement constitute cruel and unusual punishment [ECF 393 at 9], this motion is not the forum for raising such an argument."  ECF 400 at 22.  Finally, the government argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of the requested relief.  *Id*. at 22-25.

Additional facts are discussed, *infra*.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States*

*v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on*

*Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. *Id.* (emphasis added).

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383. And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria. *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th

Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[3]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See*, *e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam). Although there are currently no applicable policy statements for the Sentencing

Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering motion for compassionate release, district court erred by failing to address defendant's evidence of rehabilitation). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ."  *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark."  *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2.  However, such changes do not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its

13

discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384-85.

Of pertinence here, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court

14

abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "'the record as a whole'" must demonstrate that the judge considered the parties' contention, and had "'a reasoned basis'" for the exercise of his or her discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3. That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence,

. . . a more robust and detailed explanation [is] required.'"  *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

### III.  COVID-19[4]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, this number rose to 1,123,836.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed May 3, 2023).

Johns Hopkins University ceased the collection of COVID-19 data as of March 10, 2023. But, it reports that, as of that date, COVID-19 had infected more than 103.8 million Americans. *Id*.

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Aug. 11, 2022),

https://bit.ly/2XoiDDh.   The judiciary, too, faced many operational challenges.   Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, Ctrs. For Disease Control & Prevention (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html.  Furthermore, "[t]he risk of severe illness from

COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

## B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed May 3, 2023). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and

19

detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL,

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months*

*to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999. Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older. *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-

vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.   Much has changed since that time.

As of May 3, 2023, the BOP had 145,388 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 350,096 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last updated May 3, 2023).

Also, as of April 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL,      https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Apr. 26, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Apr. 26, 2023);   Moreover, approximately 54.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated May 2, 2023).

**D.**

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on

Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.  But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST

(Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."    *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.    As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.    But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 28, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,   https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland

Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).   Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.   Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over." *Id*.  Indeed, as noted, Johns Hopkins University has ceased collecting COVID-19 data.  *See COVID-19 Dashboard, supra,* https://bit.ly/2WD4XU9.

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, effective May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).   And, Congress passed a joint resolution (H.J. Res. 7) seeking to end the national emergency.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of April 19, 2023, 185 federal inmates, out of a total population of 145,196, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 44,375 inmates and 15,269 staff have recovered from the COVID-19 virus.  In addition, 316 inmates and seven staff members have died from the virus.  The BOP has completed 128,646 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Beckley, where the defendant is imprisoned, the BOP reported that as of May 3, 2023, out of a total of 1,680 inmates, one inmate and zero staff members currently

test positive, zero inmates and zero staff members have died of COVID-19, and 170 inmates and 172 staff have recovered at the facility.  In addition, 235 staff members and 1,343 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/mck/ (last accessed May 3, 2023).

### IV.  Discussion

### A. Exhaustion

I first consider whether defendant exhausted his administrative remedies.  As discussed above, the government contests that Horton has satisfied his administrative exhaustion requirements.  ECF 400 at 15.

As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

In *Muhammad*, 16 F.4th at 129, the Fourth Circuit made clear that, under a plain reading of the statute, after 30 days have passed from the Warden's receipt of a compassionate release request, the inmate may directly petition the court.  "The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies." *Id*.  Thus, the term

28

administrative "exhaustion," although commonly used, may to some extent be a misnomer.  In any case, the statute is clear that a defendant must have, at the very least, directed a compassionate release request to the warden before filing such a request in court.  *See McCoy*, 981 F.3d at 276 (noting that "defendants now may file motions for sentence modifications on their own behalf, *so long as they first apply to the BOP*.") (emphasis added).

The Fourth Circuit also clarified in *Muhammad*, 16 F.4th at 130, that this administrative requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. This means that it can be "waived if it is not timely raised." *Id*. at 129.

The government's Opposition asserts that "according to the BOP, there is no record of the Defendant having filed an administrative request for compassionate release."  ECF 400 at 15.  In support, it has attached email correspondence with the BOP which states that there were "[n]o [reduction in sentence] requests in [its] database and no Administrative Remedy data exists for inmate Horton."  ECF 400-3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *Hamilton*, 715 F.3d at 337; *Edwards*, 2020 WL 1650406, at *3.  And, in his Motion, Horton has attached his request to the Warden of FCI Beckley for administrative remedy (ECF 393-1 at 1) as well as an affidavit affirming, "under the penalties of perjury, that the attached "REQUEST FOR ADMINSTIRATIVE REMEDY" form . . . was submitted to K. Heckard (Warden at F.C.I. Beckley) on July 26, 2022."  *Id*. at 2. Accordingly, as there is evidence that Horton has satisfied the administrative exhaustion requirement, I shall address the Motion on the merits.

**B. Merits**

I next consider whether defendant has presented the Court with an extraordinary and compelling reason for his release.

As noted, Horton complains of untreated mental health problems and inadequate medical care.  ECF 393 at 4-8.  In particular, defendant alleges that he suffers from anxiety disorder, adjustment disorder, and PTSD, and he claims that he has been denied the use of his prescribed medications.  *Id*. at 6.  Moreover, he asserts, *id*.: "Without counseling and medication, Gary Horton's medical condition continues to deteriorate."  However, defendant's medical records reflect that on May 10, 2022, the day defendant self-surrendered to FCI Beckley, he was "offered mental health medications" but declined medication, "as he feels like he does not need anything at the moment."  ECF 400-5 at 5.

Defendant also points to other health issues.  ECF 393 at 6.  For example, he asserts that he has a lump on his neck that did not respond to antibiotics.  *Id.*  Although he claims that it should be surgically removed, he states that "surgery will not take place . . . ."  *Id.*

Further, defendant asserts that he suffers from morbid obesity, with a BMI of 39.04.  *Id.* at 7.  And, he also suffers from seizures and a Vitamin D deficiency.  *Id.*

The government observes that on May 19, 2022, Horton reported having a panic attack and severe anxiety.  ECF 400-7 at 1.  As a result, defendant was prescribed two separate medications to address his anxiety disorder.  *Id*.  On June 29, 2022, defendant had another clinical visit where he explained that "he feels his medication is not as effective as it might be."  ECF 400-8 at 1.  Consequently, the dosage of one of his medications was increased from 20 mg to 40 mg.  *Id*. at 3.  The Court was not provided with records that postdate this visit.  However, the medical records

that were provided do not reflect that the facility has ignored defendant's health issues or otherwise failed to address them.

Horton also argues that he is subject to harsh conditions during the pandemic, including lockdowns, and has been denied adequate access to medical care, mental health services, and programming.  ECF 393 at 4-8.  Moreover, Horton contends that the lockdowns, where inmates are in their cells for 23 hours and 50 minutes per day, exacerbate his mental health issues.  *Id.* at 7-8.  And, defendant states that he cannot earn additional credits pursuant to the First Step Act, as "[t]he ability to earn program time which is needed to earn the days off is virtually impossible" due to the lockdowns.  *Id*. at 8.

Indeed, the Motion characterizes defendant's incarceration as "particularly difficult even reaching the point of 'cruel and unusual punishment.'"  ECF 393 at 9.  Notably, "[c]laims that prison officials failed to provide adequate medical care to an inmate . . . sound in the Eighth Amendment."  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation omitted).  But, the "harsh conditions of imprisonment occasioned by the COVID-19 pandemic are not, without more, sufficiently extraordinary and compelling to warrant compassionate release."  *United States v. Hall*, JKB-04-0323, 2022 WL 2105975, at *3 (D. Md. June 10, 2022) (internal quotations and citation omitted).

Although Horton could seek relief for an alleged constitutional violation "in an appropriate [civil] lawsuit, '[a] motion for compassionate release is not the proper vehicle for an Eighth Amendment claim, and the Eighth Amendment protections and standards are not applicable to the compassionate release analysis under Section 3582(c).'"  *United States v. Langford*, JKB-15-0539, 2022 WL 1443868, at *3 n.3 (D. Md. May 6, 2022) (quoting *United States v. Wiley*, FDW-03-0205, 2021 WL 1234595, at *1 n.1 (W.D.N.C. Apr. 1, 2021)); *see also United States v. Akers*,

KHV-4-20089-1, 2022 WL 2438388, at *4 (D. Kan. July 5, 2022) ("Claims which assert potential constitutional violations should be brought—if at all—in a separate civil action, not as part of a motion for compassionate release.").

However, Horton's medical records indicate that he suffers from at least one condition that the CDC identifies as a risk factor for a more serious case of COVID-19.  Specifically, defendant's medical records reflect a BMI of 39.04 on May 3, 2022 (ECF 393-11 at 3), and 37.5 on May 18, 2022.  ECF 400-9 at 1.  According to the CDC, a person is considered obese if his BMI is 30 or higher.  *About Adult BMI*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last accessed May 9, 2023).  And, some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release.  *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).  Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

On the other hand, defendant has received two doses of the COVID-19 vaccine.  ECF 400-4.  The COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.

But, they are not entirely effective.  Indeed, "[t]he variants have shown a remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022).

Furthermore, the CDC issued recommendations encouraging everyone ages 12 years and older to receive a COVID-19 booster shot after completing primary COVID-19 vaccination (*see COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3MdQMM6 (last updated Aug. 23, 2022)), and all adults ages 50 years and older are eligible for a second booster shot.  *Id.*  Yet, the government has not presented the Court with any evidence regarding whether defendant has received a booster.

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  An analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Therefore, the fact of defendant's vaccination does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release.  Moreover, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021

WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."  Accordingly, that Horton has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccination status.  *See*, *e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis). "At the end of the day, district judges are not epidemiologists."  *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

In light of the evolving nature of COVID-19, coupled with defendant's various medical issues, I conclude that Horton's vaccination status does not render him ineligible for compassionate release.  Although defendant's medical records do not reflect that the BOP is incapable of providing Horton with proper treatment for his mental health conditions, I am of the

view that he satisfies the "extraordinary and compelling" prong of the § 3582 analysis, based on his obesity.  Even so, this does not end the inquiry.

The coronavirus is not "tantamount to a 'get out of jail free' card."  *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See Bethea*, 2022 WL 17588045, at *5; *High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

In my view, a balancing of the § 3553(a) factors readily indicates that defendant's release from prison is not warranted at this time.  Indeed, the Motion does not even address the § 3553(a) factors.

The government argues that defendant is a danger to the community, citing, *inter alia*, the seriousness of his offense and his prior criminal history.  ECF 400 at 23-25.  There is no doubt that defendant's crime was serious.  He played a significant role in an extensive drug conspiracy, involving "more than 1.5 kilograms of cocaine, approximately 31 grams of heroin, and more than 2 kilograms of marijuana."  *Id*. at 23.  Additionally, at sentencing, the Court noted that this was "a serious offense" involving not "just one weapon, but a cache of them."  ECF 386 at 28-29.  The Court also observed that "drugs and guns and weapons are a very dangerous combination" and

that "[p]eople have them so they can use them." *Id*. at 29.   Accordingly, I agree with the government that the nature of Horton's offense weighs heavily here.

Furthermore, Horton has a significant criminal history.   As the Court observed at sentencing, defendant has several prior convictions. *Id*. at 30-31.   Horton's record includes "two felony drug cases" and a "very serious offense in which, while incarcerated, [defendant] stabbed someone." *Id*. at 31.   In addition, Horton has a prior federal conviction for participating in a racketeering conspiracy for which he was sentenced to three years' incarceration.   ECF 321, ¶ 37. Significantly, defendant also has a history of offending while on supervised status.   For example, he previously violated his supervised release conditions in his prior federal case and was sentenced to an additional 18 months' incarceration. *Id*.   Yet, he was not deterred from further criminal misconduct.

Despite a significant number of criminal convictions and sentences, a review of Horton's criminal history makes plain that the criminal justice system has repeatedly treated defendant with great leniency.   ECF 321, ¶¶ 33-37.   Yet, that did not lead Horton to change his conduct; he continued to engage in criminal activity, which culminated in his federal prosecution in this case. And, there were times when Horton was sentenced to a significant term of incarceration.   Yet, those sentences did not set Horton on the proper path.

Moreover, the C Plea was tendered during the pandemic.   Although the Court was not privy to the plea discussions, the parties were well aware of COVID-19, and it seems likely that they would have taken it into account in reaching the agreed-upon sentence.   And, as noted, defendant's sentence fell well below the Guidelines range for Counts One and Twelve.   ECF 321, ¶ 77.

## V. Conclusion

In sum, the Court remains troubled by the severity of defendant's offenses of conviction, coupled with his criminal history and his repeated failure to conform his conduct to societal expectations. Defendant's early release would not promote respect for the law. And, the remaining § 3553(a) factors also militate against Horton's immediate release. Simply put, this is not the "grievous case[]" warranting compassionate relief. *McCoy*, 981 F.3d at 287.

For the foregoing reasons, I shall deny the Motion (ECF 393), without prejudice. An Order follows, consistent with this Memorandum Opinion.


Date:   May 10, 2023                                      _____/s/_____
                                                          Ellen Lipton Hollander
                                                          United States District Judge